**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| R.K.W., a minor,<br>by and through her NEXT FRIEND,<br>TIFFANY NGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:24cv77 |
| | ) | |
| WAHINGTON COUNTY, VA SHERIFF<br>BLAKE ANDIS, in his official and personal<br>capacities, | ) | JURY TRIAL DEMANDED |
| | ) | |
| and | ) | |
| | ) | |
| WASHINGTON COUNTY, VA<br>SHERIFF'S OFFICE, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WAHINGTON COUNTY, VA DETECTIVE<br>WILLIAM SMARR, in his official<br>and personal capacities, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MICHAEL CAREY, ADMINISTRATOR OF<br>THE ESTATE OF<br>AUSTIN LEE EDWARDS, deceased, | ) | |
| | ) | |
| Defendants. | | |

## COMPLAINT

COMES NOW Plaintiff, R.K.W., a minor, by and through her Next Friend, Tiffany Ngo, by counsel, and for her Complaint against Defendants Sheriff Blake Andis, Washington County, VA Sheriff's Office, Detective W.W. Smarr, and Michael Carey, Administrator of the Estate of Austin Lee Edwards, deceased, states as follows:

## PARTIES

1.     Plaintiff R.K.W., born on January 25, 2007, is currently sixteen (16) years old. R.K.W. sues by her Next Friend, Tiffany Ngo, who resides in Richmond, Virginia.

2.     Defendant Sheriff Blake Andis ("Sheriff Andis") is the Sheriff of the Washington County Sheriff's Department.  He is sued here in both his official and personal capacities.

3.     Defendant Washington County Sheriff's Office ("WCSO") is a constitutional office directed by the Sheriff of Washington County, who is elected at-large for a four-year term.

4.     At all times relevant hereto, Detective W.W. Smarr was a detective employed by the Washington County Sheriff's Department in Washington County, Virginia

5.     Defendant Michael Carey is the Administrator of the Estate of Austin Lee Edwards, deceased, having so qualified in the Circuit Court for the City of Richmond on December 14, 2023, pursuant to Va Code § 64.2-454.

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 1983.

7.     This Court has personal jurisdiction over Defendants because they are citizens of the Commonwealth of Virginia.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Carey's decedent was, at times relevant to this action, a resident of Petersburg and Richmond, Virginia, and used these addresses to make the contact and communicate with R.K.W., and all defendants are residents of the Commonwealth of Virginia (28 U.S.C. § 1391(b)(1)); and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in occurred in this district (28 U.S.C. § 1391(b)(2)).

## FACTS

9.      This case arises out of a horrific mass murder and abduction that occurred on November 25, 2022, in Riverside, California. The assailant, Austin Lee Edwards, deceased, used his position as a Deputy Sheriff with the Washington County Sheriff's Department, including the indicia of state authority, to gain access to and murder three people and abduct a fourth, in Riverside, California.  The deaths and the abduction were the direct and proximate result of the Washington County Sheriff's violations of the Fourteenth Amendment of the United States Constitution, actionable pursuant to 28 U.S.C. § 1983, as set forth below.

### *Catfishing*

10.      "Catfishing" is the process of luring a person into a relationship by means of a fictional online persona.  It was through this deceptive process that Austin Lee Edwards targeted R.K.W.

11.      At all times relevant herein, R.K.W. lived in Riverside, California in a single-family home (the "Winek Home") with her mother, Brooke Winek ("Brooke"); her sister, B.W.; her grandfather, Mark James Winek ("Mark"); and her grandmother, Sharon Ann Winek ("Sharon").

12.      In the summer of 2022, R.K.W. met Austin Edwards online through her Instagram account and began communicating with him on both Instagram and Discord.

13.      Edwards made these communications in Chesterfield and Richmond.

14.      Edwards told R.K.W. through their online communications that he was seventeen years of age and that he would be turning eighteen on September 1, 2022.  In reality, Edwards was 28 years old.

15.      R.K.W. kept her online relationship with Edwards a secret from her family.

16.      Throughout the summer and early fall of 2022, Edwards and R.K.W. messaged and sent voice recordings to each other and became involved in an online relationship with each other.

Edwards sent R.K.W. gifts, including jewelry; paid for her UberEats and Door Dash deliveries; sent her groceries, money and gift cards; and helped her buy birthday gifts for her friends. Edwards told R.K.W. that he had a "good job."

### The Hiring of Austin Lee Edwards as a Washington County Deputy Sheriff

17.     The WCSO hired Edwards as a Patrol Deputy by WCSO on November 16, 2022, ten days before he committed the crimes out of which this action arises.

18.     Before his employment with the WCSO, Edwards had been employed by the Virginia State Police ("VSP") as a trooper, having completed the VSP Academy in January 2022. He resigned from the VSP in October 2022.

19.     Neither the VSP nor the WCSO performed an adequate background check on Edwards before hiring him.

20.     The investigator for the WCSO who reviewed Edwards's application to become a deputy sheriff, Detective Smarr, contacted the VSP for background information concerning Edwards. Apparently, the VSP representative stated that he was not comfortable discussing Edwards's background.

21.     On his Background Investigation Report, Smarr claimed to have conducted an FBI record check, and also checked the Central Criminal Records Exchange ("CCRE"); National Crime Information Center ("NCIC"); and the Virginia Criminal Information Network ("VCIN").

22.     Edwards listed three references on his application for employment with the WCSO. One of them was his father, and Detective Smarr failed to contact him. Detective Smarr attempted to contact the other two references, but he never reached either of them and never followed up. Hence, Detective Smarr never spoke to any of the references Edwards listed other than his previous employer at Lowe's. Detective Smarr attempted to contact Edwards's neighbors but found no one

at home.  As with the personal references Edwards listed, Smarr never followed up with Edwards's

neighbors.

23.     Upon information and belief, significant portions of Edwards's employment application

was left blank. There was no response on the application with respect to whether Edwards had a

weapons permit or if his permit had ever been revoked.  There was no response to whether he had

been convicted of a crime or whether he had ever been "questioned by law enforcement" or

"detained."  There was no response to the question as to whether he had ever acted out in violence

towards another person, physically or verbally; whether he had ever been the subject of a civil

restraining order, protection order, or contact order.

24.     Smarr concluded that Edwards was suitable for hire because he had no criminal history or

civil issues, and employers spoke positively about him, as did his references.  However, this

overlooked the fact that Smarr never spoke with the references provided, and the VSP never

disclosed any information about Edwards.

25.     If the VSP or the WCSO had performed a background check on Edwards, neither of them

would have hired Edwards.

26.     Detective Smarr's representation that he checked the CCRE for information on Edwards's

background was false; if he had checked the CCRE, it would have revealed a 2016 incident in

which Edwards was detained for psychiatric evaluation after threatening to kill his father and

himself. Edwards was taken into custody after he cut his hand, and emergency medical technicians

had to call police to help restrain him.

27.     Edwards was taken to a local hospital after the 2016 incident, where he was detained under

an emergency custody order. Later the same day, a judge approved a temporary detention order

and Edwards was transferred to a local psychiatric facility.

28.     Edwards' father told police after the 2016 incident that he did not know why his son harmed himself but said it might have been related to troubles with his girlfriend.

29.     If it had conducted a background check, WCSO also would have discovered that Edwards's right to own a gun was revoked as a result of the 2016 incident.

30.     A spokesperson for the VSP has admitted that the failure to perform a background check on Edwards was the result of "human error," and it would not have hired any officer candidate who it knew had been detained under an emergency custody order and a temporary detention order.

31.     When WCSO hired Edwards as a deputy sheriff, it issued him a badge and a service revolver.  He would go on to use both the badge and the weapon to commit murder, arson, and kidnapping nine days later.

### *Events Leading Up to and Including November 25, 2022*

32.     R.K.W. broke off the online relationship with Edwards soon after Halloween of 2022 because Edwards had become "clingy" and "pushy" and wanted her to engage in activity of a sexual nature, including sending him naked photos of herself, with which R.K.W. was uncomfortable. R.K.W. blocked Edwards on Instagram, after which he emailed her a suicide note.

33.     In the interim between the break-up of their online relationship and Thanksgiving 2022, the WCSO hired Edwards as a deputy sheriff on November 16, 2022.  Edwards took time off from work beginning on Wednesday, November 23, 2022, and began a two-day driving trip from Virginia to California.

34.     On Thursday, November 24, 2022, Thanksgiving Day, R.K.W. went with her mother, Brooke; her sister, B.W.; and Brooke's boyfriend, Travis Thompson ("Thompson") to Golden Corral for dinner.  They then stayed overnight at Thompson's apartment in Moreno Valley, California, where they stayed up late playing board games.

35.     At approximately 8:30 a.m. the following morning, November 25, 2022, R.K.W., B.W., and Brooke went to Starbucks in Brooke's car. They had plans to go shopping with Thompson that day, but as they returned to Thompson's apartment, Sharon, R.K.W.'s grandmother, called Brooke from the Winek Home. Sharon told Brooke to take her off the speaker phone because she needed to speak only to Brooke about something very serious.

36.     After Brooke's telephone conversation with Sharon ended, Brooke collected R.K.W. and B.W.'s cell phones and R.K.W.'s watch and told them that there was something wrong with their phones and they had to go the Winek Home to get their grandmother's card in order to fix them. They returned to Thompson's apartment, delivered his coffee from Starbucks and then left Moreno Valley in Brooke's car.

37.     At approximately 9:42 a.m. on November 25, 2022, Sharon called Mychelle, Brooke's sister, from the Winek Home.  Sharon told Mychelle that there was a detective at the Winek Home, and that he was there concerning R.K.W.'s exchange of lewd photographs with a peer.  During the conversation, Sharon spoke in hushed tones as if to prevent the "detective" from overhearing the conversation.  The "detective' grabbed the phone from Sharon and told Mychelle that Sharon was just distraught.

38.     Shortly thereafter, Brooke arrived at Mychelle's home.  Brooke dropped B.W. off with Mychelle and told Mychelle that she needed to go meet with her parents and the detective at the Winek Home.

39.     After dropping B.W. off at Mychelle's home, Brooke drove R.K.W. to the Winek Home. Brooke turned off the car, put the keys in her purse, and told R.K.W. to wait in the car.  After Brooke entered the house, R.K.W. noted that she did not see her mother's dog in the window,

which was odd as the dog usually came to the window whenever people arrived, and she also noted that all of the windows in the house were closed, which was unusual.

40.     After waiting in the car for an extended period of time, R.K.W. decided to enter the Winek home.  She opened the screen door and began to open the wooden entry door when a man she did not recognize pulled her by her hair into the house.  Her first thought was that it was the man who was there to fix the phones, which was the reason her mother told her that they needed to go to the Winek Home.

41.     Once she entered the house, R.K.W. saw Sharon in the entryway, Mark beyond Sharon near the stairs, and Brooke on the hardwood floor.  They were all lying face down with bags over their heads that were taped at the neck.  Their arms were bound behind them with duct tape, and their legs were taped together as well.  R.K.W. began to scream.

42.     The man who pulled R.K.W. into the house was Edwards, but R.K.W. did not immediately recognize him.  Edwards was wearing a heavy police badge on his belt in the shape of a star.  It was gold on the front and black on the back. As R.K.W. screamed, Edwards pointed a semi-automatic handgun with a star engraved on it at her.

43.     As Edwards spoke, R.K.W. recognized his voice from their cell phone conversations, and Edwards told her who he was.  He told her to stop screaming.  When she asked if he was going to hurt her, Edwards stated that he would not hurt her if she would stop screaming.

44.     Edwards grabbed R.K.W. and pulled her around the interior of the house with a gas canister that he used as he set fires in the rooms.  He opened the windows and doors of the house so that the fire would spread.  Edwards then took her outside and forced her into the back seat of his vehicle.

45.     Upon his arrival to the Winek Home, Edwards had parked his vehicle in a neighbor's driveway.  The neighbor had called the police about the suspicious vehicle in her driveway, but she called again after seeing Edwards force R.K.W. into his vehicle.

46.     Edwards then sped off from the Winek Home.  He told R.K.W. to pretend she was his daughter if anyone asked, that he was going to take her back to Virginia now that she has nothing in California, and he had to kill her family so he would be able to take her.

47.     Edwards told R.K.W. that he was a police officer, and that they "need to do better backgrounds".  Edwards also talked to her about what he learned in the police academy.  He took the badge off his belt as he drove.

48.     R.K.W. asked Edwards why he killed her family.  He told her that if he did not kill them, they would "report it" and he would not have enough time to escape California and return to Virginia. He also told R.K.W. that he had made Sharon call Brooke earlier that day.

49.     Edwards continued to drive, keeping his hand on the firearm.  He also had a large knife that was covered in blood. They stopped twice to use the bathroom at porta-potties.  He never let go of R.K.W.'s hand whenever they exited the vehicle.  They also stopped at one point so that he could clean up the blood that was all over his body.  He told R.K.W. that they would not stop for food until they left California, and that their route would be through Las Vegas, New Mexico, and Texas.  He told her that she would have to stay in the back of the car until they got her a change of clothing.

50.     After Edwards abducted R.K.W., a neighbor noticed the house was on fire and called the police. When Riverside police and firefighters arrived on the scene, the house was engulfed in flames. A firefighter entered the home and found Sharon, Mark, and Brooke's bodies just inside the front door. All three were deceased.

51.     The Riverside police officers canvassed the area and conducted multiple interviews of neighbors, allowing them to track down Edwards based on the descriptions of his vehicle and video and photos from the neighbors' surveillance cameras.

52.     Police used a PING to trace Edwards and a pursuit ensued.

53.     Edwards told R.K.W. that if he was caught, he was going to kill himself.

54.     During the pursuit, Edwards began shooting the firearm through the back window of the vehicle. The vehicle filled with smoke. Edwards had placed a large gas canister in the back seat with R.K.W., and the top had popped off and splashed her, and she feared that she would catch on fire.

55.     In the midst of the pursuit, Edwards's vehicle became stuck on rocks under a bridge and the police vehicles caught up to him. Edwards told R.K.W. that he was going to shoot himself and instructed her to get out of the vehicle, which she did.

56.     R.K.W. feared that the police would think that she was also "bad" and might shoot her, but she exited the vehicle and ran away from the scene.

57.     Edwards then shot and killed himself with the firearm, and the Riverside police took R.K.W. into custody.

## **CAUSES OF ACTION**

### **COUNT I – VIOLATION OF 42 U.S.C. § 1983**
### **FAILURE TO SCREEN**

**(Plaintiff v. Defendants Sheriff Blake Andis and Washinton County Sheriff's Office)**

58.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

59.     As the Sheriff of Washington County, Defendant Sheriff Andis is the chief policymaker for the WCSO where Edwards was hired on November 16, 2022.

60.     Defendant Sheriff Andis showed deliberate indifference in failing to adequately screen Edwards before hiring him as a Washington County Sheriff's Deputy.

61.     Had Defendant Sheriff Andis adequately screened Edwards, he would have understood that the plainly obvious consequence of hiring Edwards, with his violent past, psychological issues, and suicidal ideations, would lead to a violation of Fourteenth Amendment rights to substantive due process, as occurred when Edwards violently abducted R.K.W. after murdering her mother, grandfather, and grandmother.

62.     In light of the duties and responsibilities of Defendant Sheriff Andis, the need for adequate screening of Sheriff's deputies was or should have been obvious.

63.     Defendant Sheriff Andis was on actual or constructive notice of Edwards's psychological history, having asserted that his background was checked through the CCRE, NCIC, VCIN, and the FBI.

64.     Had Defendant Sheriff Andis properly screened Edwards before hiring him as a Sheriff's deputy and not acted with deliberate indifference in making his hiring decision, he would have discovered (1) the 2016 incident in which Edwards was detained for psychiatric evaluation after threatening to kill his father and himself; (2) Edwards was taken into custody after he cut his hand and emergency medical technicians had to call police to help restrain him; (3) Edwards was taken to a local hospital after the 2016 incident, where he was detained under an emergency custody order; (4) Edwards was placed under a temporary detention order as a result of the incident; (5) Edwards was transferred to a local psychiatric facility as a result of the incident; (6) Edwards' father told police after the 2016 incident that he did not know why his son harmed himself but said

it might have been related to troubles with his girlfriend; and (7) Edwards's right to own a firearm was revoked as a result of the 2016 incident.

65.    Had Defendant Sheriff Andis properly screened Edwards and not acted with deliberate indifference in making his hiring decision, he would not have hired Edwards as a Deputy Sheriff and provided him with a badge and a service revolver.  As the VSP admitted in its public statements after Edwards brutally murdered his victims and abducted R.K.W. in California, it would not have hired him had it known of his history.

66.    Defendant Sheriff Andis, in failing to properly screen Edwards for a position with the WCSO as a Deputy Sheriff, disregarded a known or obvious consequence of his conduct.

67.    Adequate scrutiny of Edwards's background would lead a reasonable policymaker in Defendant Andis's position to conclude that the plainly obvious consequences of the decision to hire Edwards would be the deprivation of a third party's federally protected rights.

68.    Due to Edwards's background, to which Defendant Sheriff Andis was deliberately indifferent, Edwards was highly likely to inflict the particular injury, i.e., using a gun, on November 25, 2022.

69.    Defendant Sheriff Andis's deliberate indifference directly and proximately caused the assault, battery, false imprisonment, abduction, and emotional distress of R.K.W.

70.     As a direct and proximate result of Defendant Sheriff Andis's deliberate indifference in his failure to screen Edwards before hiring him and issuing him a badge and service revolver, R.K.W. suffered injury, damage, loss and harm on November 25, 2022.

## COUNT II:  VIOLATION OF 42 U.S. CODE § 1983

### (Plaintiff v. Michael Carey, Administrator of the Estate of Austin Lee Edwards)

71.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

72.     At the time of Edwards' commission of the murders, arson, assault, battery, false imprisonment and abduction of R.K.W. on November 25, 2022, Edwards was acting under color of state law, which includes acting under the pretense of law, as a sworn deputy sheriff employed by the WCSO.

73.     Under the Fourteenth Amendment to the United States Constitution, Edwards was prohibited from using his position as a Deputy Sheriff, including the indicia thereof, to violate the rights of substantive due process of any person.

74.     The foregoing actions of Edwards deprived R.K.W. her rights secured under the Fourteenth Amendment of the United States Constitution, which provides that no State may "deprive any person of life, liberty, or property without due process of law."

75.     Edwards purported to act pursuant to his authority as a government official, i.e., a Deputy Sheriff, in order to gain access to and the trust of his victims at the Winek Home.

76.     Edwards's actions have a sufficiently close nexus with the WCSO to be fairly treated as that of the State itself.

77.     In order to gain entry into his victims' home on November 25, 2022, outward indicia suggestive of state authority – including his badge, service revolver, and informing his victims that he was a detective – to give the impression that he was there on official government business.

Furthermore, telling his victims that he was there to discuss illicit photographs sent by R.K.W. gave the indicia of governmental authority.

78.     Edwards's conduct occurred during the course of his performance of an apparent duty of office, and he could not have behaved in that way but for the authority provided to him by the office.

79.     Edwards would not have been able to obtain a firearm legally on his own, as his right to own a weapon had been revoked as a result of his conduct in 2016.

80.     The indicia of governmental authority provided to Edwards enabled Edwards to execute his scheme in a manner that private citizens never could have.

81.     Edwards carried out his scheme to gain vengeance against R.K.W. by invoking his police authority to carry it out by identifying himself as a detective or police officer who was there to discuss R.K.W.'s lewd photographs and using his Sheriff's badge and department-issued service revolver to gain access to the inside of the Winek Home where he assaulted, battered, and falsely imprisoned R.K.W. after murdering her family.

82.     As a direct and proximate result of the foregoing acts, Defendant's decedent assaulted, battered, and falsely imprisoned R.K.W causing her injury, damage, loss and harm.

## COUNT III: ASSAULT

### (Plaintiff v.  Michael Carey, Administrator of the Estate of Austin Lee Edwards)

83.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

84.     The acts committed by Defendant's decedent against R.K.W. constitute assault.

85.    Edwards's actions were overt and intentional.

86.    Edwards acted with the intent and purpose of placing R.K.W. in apprehension of imminent harmful and offensive contact.

87.    Edwards acted with the knowledge that he would place R.K.W. in apprehension of imminent harmful and offensive contact.

88.    Edwards's actions created a reasonable apprehension of imminent harmful and offensive contact with R.K.W. in R.K.W.'s mind.

89.    Edwards committed acts which caused injury to R.K.W. by subjecting her to apprehension of imminent harmful and offensive contact and/or intentional invasions of her rights to be free from offensive and harmful conduct.

90.    Edwards assaulted R.K.W. by pointing his semi-automatic handgun with a start on it at her after she entered the house and saw that he had murdered her mother, grandmother, and grandfather. Edwards further intentionally placed R.K.W. in apprehension of imminent harmful and offensive contact when he set fire to the Winek Home, told her he would harm her if she did not remain quiet, and forced her into his car.

91.    R.K.W. did not consent, at any point, to the apprehension of imminent harmful and offensive contact which caused R.K.W. injury, damage, loss and harm.

**COUNT IV: BATTERY**

**(Plaintiff v.  Michael Carey, Administrator of the Estate of Austin Lee Edwards)**

92.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

93.     The acts committed by Edwards against R.K.W constitute battery.

94.     Edwards intended to cause harmful and offensive physical contact with R.K.W.

95.     Edwards intentionally made harmful and offensive physical contact with R.K.W.

96.     Edwards battered R.K.W. by violently grabbing her by the hair when she entered the Winek Home and saw her mother, grandmother, and grandfather face down, dead, bound with duct tape, with plastic bags over their heads.

97.     Edwards continued to batter R.K.W. as he dragged her outside, after setting fire to the Winek Home, physically forced R.K.W. into the back seat of his vehicle and drove off with plans of taking her back to Virginia.

98.     R.K.W. did not consent, at any point, to Edwards's harmful and offensive contact, which caused R.K.W. injury, damage, loss and harm.

### COUNT V: FALSE IMPRISONMENT

**(Plaintiff v.  Michael Carey, Administrator of the Estate of Austin Lee Edwards)**

99.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

100.    The acts committed by Edwards against R.K.W. described herein constitute false imprisonment, actionable under Virginia law.

101.    Edwards intentionally restricted R.K.W.'s freedom of movement without legal right to do so.

102.    Edwards intentionally used force, words, and actions that R.K.W. was afraid to ignore and reasonably believed she must submit.

103.    Edwards falsely imprisoned R.K.W. by violently grabbing her by the hair once she entered the home and forcing her into the back seat of his vehicle after murdering her mother, grandmother, and father, and setting fire to the home.

104.    R.K.W. was afraid to ignore Edwards and reasonably believed she must submit to his authority as he pointed his semi-automatic handgun with a star on it at her, saw the star-shaped police badge on his hip, and saw her mother, grandmother, and grandfather dead on the floor.

105.    As a direct and proximate result of the foregoing, R.K.W. suffers from ongoing severe emotional distress and mental anguish.

106.    Edwards's foregoing conduct caused R.K.W. injury, damage, loss and harm.

### COUNT VI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Plaintiff v.  Michael Carey, Administrator of the Estate of Austin Lee Edwards)

107.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

108.    As described in the incorporated paragraphs, Edwards's conduct of assaulting, battering, falsely imprisoning and abducting R.K.W. after murdering her mother, grandmother, and grandfather was intentional, reckless, and Edwards knew or should have known that severe emotional distress would likely result.

109.    Edwards's conduct was so outrageous in character, so extreme in degree, as to go beyond all bounds of decency, and can only be regarded as atrocious and utterly intolerable in a civilized community.

110.     Edwards's conduct directly and proximately caused R.K.W. severe and ongoing emotional distress, mental anguish and psychological harm.

### COUNT VII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Plaintiff v.  Michael Carey, Administrator of the Estate of Austin Lee Edwards)

111.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

112.     Edwards negligently inflicted emotional distress upon R.K.W. by assaulting, battering, falsely imprisoning and abducting R.K.W. after murdering her mother, grandmother, and grandfather.

113.     Edwards' conduct directly and proximately caused R.K.W ongoing physical injury, severe emotional distress, and mental anguish.

### COUNT VIII: VICARIOUS LIABILITY

### (Plaintiff v. Defendants Sheriff Blake Andis Washinton County Sheriff's Office)

114.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

115.     At all relevant times, Edwards was an employee of the WCSO.

116.     At all relevant times, Edwards was employed as a Deputy Sheriff with the WCSO.

117.     At all relevant times, using a gun and badge and making citizens submit to authority was within the ordinary course of Edwards's job as a Deputy Sheriff.

118.   At all relevant times herein, Edwards's position as Deputy Sheriff was subject to the direct control and supervision of the WCSO and Edwards, at all times, acted with the actual and apparent authority of the WCSO and in the scope and course of his employment, agency, and service.

119.   At all relevant times herein, the WCSO employed, hired, approved, sponsored, authorized, ratified and condoned Edwards's actions by equipping him with a service revolver and badge.

120.   Edwards assaulted, battered, falsely imprisoned and abducted R.K.W. using a semi-automatic handgun with a police badge on his hip, within the scope of his employment with WCSO.

121.   Edwards relied on his authority as a Deputy Sheriff at WCSO to assault, batter, falsely imprison and abduct R.K.W.

122.   At all relevant times herein, Edwards' foregoing conduct was within the scope of his employment, agency, and service of the WCSO.

## COUNT IX: NEGLIGENT HIRING

**(Plaintiff v. Defendants Detective William Smarr and Washington County Sheriff's Office)**

123.   Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

124.   As the investigator for the WCSO in charge of reviewing Edwards's employment application to become deputy sheriff and conducting his background check, Defendant Detective Smarr negligently hired Edwards.

125.   Defendant Detective Smarr failed to contact the three references listed on Edwards's employment application. Defendant Detective Smarr chose not to speak with Edwards's father

who knew about Edwards's violent past and psychological issues that would foreseeably lead to injury and/or death to others.

126. Defendant Detective Smarr attempted to contact Edwards's neighbors but found no one at home so he decided to forego trying to reach them.

127. Defendant Detective Smarr negligently concluded that Edwards was suitable for hire despite not speaking with Edwards's references and overlooking various parts of Edwards's employment application that was left blank.

128. Defendant Detective Smarr was on actual or constructive notice of Edwards's psychological history, having asserted that his background was checked through the CCRE, NCIC, VCIN, and the FBI.

129. In making the decision that Edward's was suitable for hire, Defendant Detective Smarr represented that he checked the CCRE for information on Edwards's background. However, had Defendant Detective Smarr checked the CCRE, he would have discovered Edwards's 2016 incident in which Edwards was detained for psychiatric evaluation after threatening to kill his father, himself, and had cut his hand. Edwards was not only detained under an emergency order but a judge also approved a temporary detention order to have Edwards transferred to a local psychiatric facility.

130. Had Defendant Detective Smarr conducted a background check, he would have discovered that as a result of the serious nature of the 2016 incident, Edwards's right to own a gun had been revoked.

131. Had Defendant Detective Smarr conducted an adequate background check, he would have understood that the plainly obvious consequence of hiring Edwards, with his violent past,

psychological issues, and suicidal ideations, would foreseeably lead to injury and/or death to others.

132.   Defendant Detective Smarr negligently represented that Edwards was suitable for hire, thereby providing him with a badge and service gun despite Edwards' known propensity for violence to others, psychological issues, and suicidal ideations.

133.   As a direct and proximate result of Defendants WSCO and Detective Smarr's wrongful acts, Plaintiff sustained damages, which she is entitled to recover from Defendants Detective Smarr and WCSO.

## COUNT X: NEGLIGENT HIRING

### (Plaintiff v. Defendant Sheriff Blake Andis Washinton County Sheriff's Office)

134.   Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

135.   Defendants Sheriff Andis and WCSO negligently hired Edwards as Deputy Sheriff on November 16, 20233.

136.   Had Defendant Sheriff Andis reasonably investigated Edwards, he would have understood that the plainly obvious consequence of hiring Edwards, with his violent past, psychological issues, and suicidal ideations, would foreseeably lead to injury to others.

137.   Defendants Sheriff Andis and WCSO were on actual or constructive notice of Edwards's psychological history, having asserted that his background was checked through the CCRE, NCIC, VCIN, and the FBI.

138.   Had Defendants Sheriff Andis and WCSO properly screened Edwards before hiring him as a Sheriff's Deputy and not acted with deliberate indifference in making his hiring decision, he would have discovered the February 2016 incident which rendered Edwards unfit and legally unable to buy or possess a firearm.

139.   Defendants Sheriff Andis and WCSO negligently hired Edwards by providing him with a badge and service gun despite Edwards' known propensity for violence to others, psychological issues, and suicidal ideations.

140.   Defendants Sheriff Andis and WCSO, in negligently hiring Edwards as a Deputy Sheriff, disregarded Edwards' known propensity for violence and causing injury to others.

141.   As a direct and proximate result of Defendants Sherif Andis and WCSOs' negligent hiring of Edwards and issuing him a badge and service revolver, R.K.W. suffered injury, damage, loss and harm.

## DAMAGES

142.   Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

143.   As a direct and proximate result of the aforementioned acts and omissions of the Defendant's decedent, R.K.W. incurred the following damages:

a.   Past, present, and future bodily injuries;

b.   Past, present, and future physical pain;

c.   Past, present and future and mental anguish;

d.   Past, present, and future inconvenience;

    e.   Past, present, and future medical expenses;

    f.   Past, present, and future lost earnings and lessening of earning capacity;

    g.   Personal, social, and financial limitations; and

    h.   Other damages allowable at law.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff moves this Honorable Court for judgment against Defendants, jointly and severally, in the sum of FIFTY MILLION DOLLARS in compensatory damages, costs and interest allowable under Virginia law, and for such other relief this Court seems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Local Rules for the United States District Court Eastern District of Virginia, Plaintiff hereby requests a trial by jury on all claims, defenses, and issues.

Dated:  February 2, 2024

                          Respectfully submitted,

                          /s/ Scott M. Perry
                          Scott M. Perry (VSB No. 67417)
                          Nicholas J.N. Stamatis (VSB No. 95423)
                          BREIT BINIAZAN, PC
                          1010 North Glebe Road, Suite 310
                          Arlington, Virginia 22201
                          Telephone: (703) 291-6651
                          Facsimile: (757) 670-3939
                          Scott@bbtrial.com
                          Nick@bbtrial.com

Kevin Biniazan (VSB No. 92109)
Jeffrey A. Breit (VSB No. 18876)
BREIT BINIAZAN, PC
600 22nd Street, Ste. 402
Virginia Beach, VA 23451
(757) 622-6000 (Telephone)
(757) 670-3939 (Facsimile)
Kevin@bbtrial.com
Jeffrey@bbtrial.com

*Counsel for Plaintiff*